IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: EQUIMED, INC.,           : | |
|     Debtor           : | |
| THE ESTATE OF EQUIMED, INC.     : | |
|     Petitioner       : | |
|                      : | CIVIL ACTION |
|     v.               : | |
|                      : | NO. 05-1815 |
| ERNST & YOUNG, LLP              : | |
|     Respondent and   : | |
|     Cross-Movant     : | |

**SURRICK, J.**                                                                                   **JUNE 30, 2006**

### MEMORANDUM & ORDER

Presently before the Court are Petitioner Estate of Equimed, Inc.'s Petition To Vacate Arbitration Award (Doc. No. 1) and Motion For Summary Judgment Or In The Alternative To Issue An Order For A Hearing On The Merits Preceded By A Discovery Period (Doc. No. 25), as well as Respondent Ernst & Young, LLP's Answer To Petition To Vacate Arbitration Award And Cross-Motion To Confirm Arbitration Award (Doc. No. 5). For the following reasons, the Petition to Vacate Arbitration Award and the Motion for Summary Judgment will be denied and the Cross-Motion will be granted.

**I.     BACKGROUND**

This dispute arises out of the contractual relationship between EquiMed, Inc. ("EquiMed") and its auditor, Ernst & Young, LLP ("E&Y"). (Doc. No. 1 ¶ 5.) In July 1998, E&Y resigned prior to completing EquiMed's audit report for the 1997 fiscal year. (*Id.*) The audit agreement between EquiMed and E&Y mandated that any dispute would be settled through mediation and, if mediation failed, through arbitration, which was to be "conducted in accordance with . . . the Arbitration Rules for Professional Accounting and Related Services

Disputes" promulgated by the American Arbitration Association ("AAA").  (Doc. No. 1 ¶ 5; *id.* at Ex. A.)  On September 7, 1999, EquiMed and E&Y commenced arbitration with the selection of arbitrators from the AAA roster.  (Doc. No. 3 at 2-3.)  E&Y's choice was James W. Durham, the former Senior Vice President/General Counsel of PECO Energy Company ("PECO").  (Doc. No. 5 at Ex. A; Doc. No. 19 at 2.)  Durham's resume, indicating his tenure and position at PECO, was made available to the parties.  (Doc. No. 3 at 3 n.4.)  Hearings began on April 22, 2003.  (*Id.* at 2.)  At these hearings, E&Y was represented by the law firm of Drinker, Biddle & Reath, LLP ("Drinker").  (Doc. No. 1 ¶ 8.)  James Clancy, a partner at the accounting firm of PriceWaterhouse Coopers ("PwC"), appeared as an expert witnesses for E&Y.  (*Id.*)  On February 3, 2005, the panel of arbitrators unanimously found in favor of E&Y.  (*Id.* ¶ 9.)

On April 19, 2005, EquiMed filed a Petition to Vacate Arbitration Award.  In this Petition, EquiMed alleged that Durham failed to disclose his prior relationships with certain parties to the arbitration and their representatives.  (*Id.* ¶¶ 10, 11.)  EquiMed claimed that it "learned, through the examination of public records, that Durham, in his position with PECO, had numerous and extensive business relationships with Drinker . . . with PriceWaterhouse Coopers . . . and, indeed, with E&Y itself."  (*Id.* ¶ 13.)  Based on this information, EquiMed called for the arbitration award to be vacated pursuant to section 10 of the Federal Arbitration Act, 9 U.S.C. § 10.  (*Id.* ¶¶ 18, 19.)  In response to EquiMed's Motion for Scheduling Order, we granted EquiMed permission to depose Durham.  (Doc. No. 15.)  The deposition took place on November 23, 2005.  On May 1, 2006, EquiMed filed this Motion for Summary Judgment (Doc. No. 25).

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

Under the United States Arbitration Act, a federal court may vacate an arbitration award "where there was *evident partiality* . . . in the arbitrators." 9 U.S.C. § 10(a)(2) (emphasis added). However, "[r]eview of arbitration awards under the FAA is extremely deferential." *Metromedia Energy, Inc. v. Enserch Energy Servs., Inc*., 409 F.3d 574, 578 (3d Cir. 2005) (internal citations omitted), *cert. denied*, 126 S. Ct. 1021 (2006). The party moving to vacate an award bears the burden of proof. *Grosso v. Barney*, No. 03-115, 2003 WL 22657305, at *1 (E.D. Pa. Oct. 24, 2003). "Vacatur is appropriate only in 'exceedingly narrow' circumstances, such as where arbitrators are partial or corrupt, or where an arbitration panel manifestly disregards, rather than merely erroneously interprets, the law." *Id.* Moreover, "[a] party to an arbitration . . . 'may not

sit idle through an arbitration procedure and then collaterally attack that procedure on grounds not raised before the arbitrators when the result turns out to be adverse.'"[1] *Smith, Breslin & Assocs. v. Meridian Mort. Corp.*, Civ. A. No. 96-424, 1997 WL 158119, at *3 (E.D. Pa. Apr. 7, 1997) (quoting *Marino v. Writers Guild of Am., East, Inc.*, 992 F.2d 1480, 1484 (9th Cir. 1993)).

While arbitrators are not expected to "sever all their ties with the business world," they are still required to "disclose to the parties any dealings that might create an impression of possible bias." *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 148. This requirement is reflected in Rule 19 of the applicable AAA rules:

> Any person appointed as an arbitrator shall disclose to the AAA any circumstance likely to affect impartiality, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives.

Am. Arbitration Assoc., *Arbitration Rules for Professional Accounting and Related Services Disputes* (July 13, 2003).

In nondisclosure cases, "'evident partiality' is established when arbitrators fail to disclose 'any dealings that might create an impression of possible bias.'"[2] *Crow Constr. Co. v. Brown*, 264 F. Supp. 2d 217, 220 (E.D. Pa. 2003) (quoting *Commonwealth Coatings Corp.*, 393 U.S. at

---

[1] We note that much of the information now offered by EquiMed was available in the public domain prior to Durham's selection as an arbitrator and could have been reviewed by EquiMed at any time before the arbitrators reached their decision. *See Andros Compania Maritima v. Marc Rich & Co.*, 579 F.2d 691, 702 (2d Cir. 1978) (where nondisclosed evidence of bias was publicly available, objection to arbitrator should have been made before or during the arbitration, not after the case was lost).

[2] In cases alleging bias absent nondisclosure, "evident partiality is only present 'when a reasonable person would have to conclude that an arbitrator was partial' to one of the parties." *Crow Constr. Co. v. Brown*, 264 F. Supp. 2d 217, 221 (E.D. Pa. 2003) (quoting *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1523 n.30 (3d Cir. 1994)).

149); *Forest Elec. Corp. v. HCB Contractors*, Civ. A. No. 91-1732, 1995 WL 37586, at *3 (E.D. Pa. Jan. 30, 1995).  However, vacatur is not appropriate where the undisclosed relationship is "trivial" or "distant," and thus does not raise any appearance of bias.  *Commonwealth Coatings Corp.*, 393 U.S. at 150 (White, J., concurring); *Norwood Co. v. Bennett Composites, Inc.*, Civ. A. No. 04-0379, 2004 U.S. Dist. LEXIS 17153, at *11-14 (E.D. Pa. Aug. 24, 2004).  Because arbitrators' "business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people" arbitrators "cannot be expected to provide the parties with [their] complete and unexpurgated business biograph[ies]."  *Commonwealth Coatings Corp.*, 393 U.S. at 151 (White, J., concurring).

### III.    LEGAL ANALYSIS

#### A.    Petition to Vacate and Motion for Summary Judgment

EquiMed bases its Petition to Vacate on Durham's failure to disclose business relationships, which EquiMed alleges Durham had with Drinker, E&Y, and PwC.  A close reveiw of the business relations proffered by EquiMed reveals that they are either trivial, remote or non-existent.  All but one of the asserted alleged business relationships stem from Durham's role as an executive at PECO.  Durham was employed at PECO from 1988 until March 1, 2001, at which time PECO finalized its merger with Unicom to form Exelon Corporation.  (Durham Dep. at 11.)  Before the merger, PECO was a major electric utility company.  In the year 2001, PECO's operating revenues were $5.95 billion.  Exelon Corp., Annual Report (Form 10-K) at 52 (Apr. 2, 2001).  At the end of 1999, PECO had 11,737 employees.  PECO Energy Co., Amended Annual Report (Form 10-K/A) at 18 (Apr. 28, 2001).  As Senior Vice President/General

Counsel, Durham was responsible for all legal matters, internal auditing, environmental services, claims, security, corporate secretary, and regulatory compliance at PECO.  (Doc. No. 5 at Ex. A.)

EquiMed cites to nine registration statements that PECO filed with the SEC between 1994 and 1998 in support of its Petition.  (Doc. No. 1 at Exs. F, G, H, I, J, K, L, M, N.)  Drinker appears in each filing.  However, Drinker acted as counsel only to the banks that bore the responsibility for offering and marketing PECO's securities.[3]  Drinker never represented PECO itself in these transactions.   Drinker attorneys served as counsel to the underwriters in three offerings (Doc. No. 1 at Exs. F, L, M, N); as counsel to the dealer managers in one offering (Doc. No.1 at Exs. H, I, J, K); and as counsel to the agents in one offering.  (Doc. No. 1 at Ex. G.)  PECO retained its own lawyers, from the law firm of Ballard, Spahr, Andrews & Ingersoll, in each of these transactions.  (Durham Dep. at 52.)  Moreover, Durham had no personal association with Robert M. Jones, the Drinker attorney named in each filing.  (*Id.* at 48.)  Neither Jones, nor any of the Drinker attorneys involved in PECO's securities offerings, were among the attorneys who represent E&Y in the instant matter.  (Durham Dep. at 139-41.)

After EquiMed filed the instant Petition, Drinker revealed that it performed a single engagement for PECO during Durham's tenure.  (Doc. No. 3 at 11 n.10.)  In his position as General Counsel, Durham managed a staff of approximately twenty-five attorneys.  (Durham

---

[3] The relationship between underwriter and issuer, though in some senses symbiotic, can legitimately be described as "adverse."  *Escott v. Barchris Constr. Corp.*, 283 F. Supp. 643, 696 (S.D.N.Y. 1968).  In this capacity, investment banks must act as "devil's advocate" to the issuing corporation.  This is because the underwriters and dealer managers are expected to "exercise a high degree of care in investigation and independent verification of the company's representations" concerning the securities being offered.  *See Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 582 (E.D.N.Y. 1971).  Where the banks fail to do so, they risk exposure to both financial losses and legal liability.  Clearly, Drinker's interests as counsel to these banks were not identical to the interests of PECO or Durham.

Dep. at 16.) While most legal issues were handled in-house, PECO retained outside counsel whenever a legal matter exceeded the expertise of its team but did not warrant adding in-house personnel. (*Id.* at 20-21.) For these matters, one of Durham's "group leaders" had the responsibility of selecting and retaining outside counsel. Durham would then approve the selection. (*Id.* at 71.) In this single engagement, PECO retained lawyers from Drinker. The legal fee generated from the engagement was $9,000. Durham had only marginal involvement in Drinker's retention, having approved the choice of his group leader. Durham testified that he had no recollection that Drinker had ever represented the company. (*Id.* at 68-69.) The lawyers involved in that matter were not among those now representing E&Y. (Durham Dep. at 139-41.)

The relationship between Durham and Clancy, the partner at PwC who served as an expert witness for E&Y, is even more remote. EquiMed offers evidence that Coopers & Lybrand, the predecessor to PwC, served as PECO's accountants from 1993 to 1997. (Doc. No. 1 at Exs. O, P, Q, R, S.) However, Clancy had no affiliation with Coopers & Lybrand prior to its 1998 merger with Price Waterhouse. (Doc. No. 1 at Ex. B, p. 18.) Therefore, any tie between Clancy and PECO existed only from 1998 to 2001, when the newly-created PwC acted as PECO's accountant. (*Id.* at Exs. T, U, V.) Significantly, there is no allegation that Clancy ever worked on the PECO account. Moreover, at no point during Durham's tenure was Durham responsible for hiring or supervising PECO's outside auditors. (Durham Dep. at 22.) Durham had no relationship whatsoever with Clancy and no "real relationship of a personal nature" with PwC in its capacity as PECO's auditor. (*Id.* at 38.)

During his deposition, Durham did reveal that he had a personal connection with one PwC tax advisor, who had previously prepared his personal tax returns. (*Id.* at 128.) PwC's

7

work for Durham consists only of the preparation of the tax returns.  The firm never provided Durham with any additional financial or investment advice.  (*Id.* at 128-31.)  Furthermore, there is no connection between the PwC employee who has prepared Durham's tax returns and Clancy.[4]

The evidence offered by EquiMed also fails to establish any material connection between Durham and E&Y.  It appears that, in 1991, E&Y was retained to prepare a Public Utility Commission (PUC) Management Report concerning PECO.  (Doc. No. 1 at Ex. W.)  In this instance, E&Y was hired by the Pennsylvania PUC, not by PECO.  (Durham Dep. at 141.)  The E&Y consultants reported to the PUC, not to PECO.  (*Id.*)  Interestingly, the Report prepared by E&Y formed the basis of a demand by shareholders that PECO commence legal action against certain of its officers and directors.  (Doc. No. 1 at Ex. W.)  Though Durham recalls the report being prepared, he had no active role in its creation or supervision.  However, PECO's in-house legal team was tasked with defending the derivative suits that resulted from the report.

EquiMed also asserts that in 2002, E&Y performed consulting services for Exelon Business Services, a subsidiary to PECO's successor. (*Id.* at Ex. X.)  Since Durham was no longer an employee of PECO or Exelon at that time, this assertion is of little significance.

Finally, after the Petition was filed, E&Y revealed that it performed a series of "relatively small engagements" for PECO during the years 1995, 1996, 1998, 2000, and 2001.  (Doc. No. 3 at 9 n.6.)  In the course of those engagements, E&Y provided PECO with "consulting work on HR systems and advice with respect to surplus real estate and 'power risk management.'" (*Id.*)

---

[4] We note that PwC is a large worldwide accounting firm with more than 130,000 employees.  *See* www.pwcglobal.com.

The annual fees realized by E&Y for these engagements ranged from $16,687 (in 2001) to $236,099 (in 1999). (*Id.*) Like PwC, E&Y is a large worldwide professional services firm. In 2005, E&Y realized $16.9 billion in worldwide revenue. *See* www.ey.com. It is not surprising that a company as large as PECO utilized E&Y and other similar firms for services of this kind. In fact, the 2002 filing cited by EquiMed indicates that Exelon Business Services spent almost $5.5 million on audit services that year, including over $3 million to PwC and $1.5 million to Arthur Andersen LLC, both competitors of E&Y, as well as almost $1.9 million in tax services to E&Y and others. Durham has no recollection that E&Y was ever retained to provide consulting work to PECO. (Durham Dep. at 87.) Neither Durham nor members of his team hired or supervised E&Y in this capacity. (*Id.* at 87-89.) The work performed by E&Y involved departments within PECO other than the legal department and did not involve Durham.

After careful review, we are satisfied that the business relationships alleged here are just the sort of remote and trivial business relationships that Justice White eluded to in his concurring opinion in *Commonwealth Coatings*. Durham's relationships with E&Y, Drinker, and PwC are not of the kind that raise any appearance of bias. None of these relationships was of any great magnitude, as indicated by the value of services exchanged compared to the size of the companies in question. *See Forest Elec. Corp*, 1995 WL 37586, at *4 n.13 (vacatur inappropriate where relationships "occurred some years ago and represented a very small percentage . . . of [the party's] business"). Moreover, with the single exception of PwC's preparation of Durham's personal tax returns, a similarly trivial connection, none of these relationships were ongoing during the time Durham served as an arbitrator in this matter. Each relationship can be traced through Durham's position at PECO. He relinquished that position in

2001.  *See Al-Harbi v. Citibank, N.A.*, 85 F.3d 680, 682-83 (D.C. Cir. 1996) (refusing to vacate award where "alleged evident partiality [did not] arise . . . from a representation by any firm with which the arbitrator was connected at the time of the arbitration").

There is nothing in the record to support a claim that Durham had any substantial personal involvement in PECO's dealings with either Drinker, E&Y, or PwC.  Durham has no connection to the Drinker attorneys involved in this case or to Clancy.  *See Int'l Produce, Inc. v. A/S Roseshavet*, 5638 F.2d 548, 551 n.3 (2d Cir. 1981) (personal feelings for one member of organization not necessarily transferred to other members of same organization).  The relationships at issue are all "one step removed." *Norwood*, 2004 U.S. Dist. LEXIS 171553 at *12.  They are between Durham and PwC, but not Clancy; between PECO and PwC, but not Durham; and between E&Y and PECO, but not Durham.  They are not only trivial and distant, they also fail to raise an appearance of bias, and they certainly do not indicate evident partiality on the part of Durham.  Vacatur of the arbitration award under these circumstances would be inappropriate.  Accordingly, we will deny EquiMed's Petition to Vacate and its Motion for Summary Judgment.

  **B.** **Request for Additional Discovery**

EquiMed had requested that we issue a scheduling order permitting additional discovery if summary judgment is denied.  (Doc. No. 25 at 27; Doc. No. 31 at 10.)  The decision to grant or deny discovery in this proceeding lies within our sound discretion.  *Lyeth v. Chrysler Corp.*, 929 F.2d 891, 898 (2d Cir. 1990) (citing *Imperial Ethiopian Gov't v. Baruch-Foster Corp.*, 535 F.2d 334, 337 (5th Cir. 1976)).  Federal courts have been understandably hesitant to grant extensive discovery in cases alleging arbitrator bias.  In pursuing such an action, a disgruntled losing party

can effect prolonged litigation and defeat the very purpose of contracting for arbitration in the first place.  *See Lyeth*, 929 F.2d at 899 ("district court properly denied discovery request" where party "presented no evidence that the individual arbitrator had any financial or personal stake in the outcome"); *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 683 (7th Cir. 1983) ("We do not want to encourage the losing party to every arbitration to conduct a background investigation of each of the arbitrators in an effort to uncover evidence of a former relationship with the adversary.").  Earlier, we granted EquiMed's request for discovery in part, permitting the deposition of Durham.  (Doc. No. 15.)  We will not, however, permit additional discovery at this juncture.  EquiMed asserts the need to further explore the services E&Y provided PECO during Durham's tenure, the extent and length of tax services that PwC provided to Durham, and the extent of Drinker's representation of PECO during Durham's tenure.  (Doc. No. 25 at 27-28.)  These areas were well-covered during Durham's deposition.  EquiMed has failed to identify any compelling reason justifying further discovery.  Accordingly, we will deny EquiMed's discovery request as well.

      **C.**    **Confirmation of Arbitration Award**

E&Y has requested that we confirm the Arbitration Award.  (Doc. No. 5.)  Section 9 of the FAA provides:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon *the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title*.  If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.

9 U.S.C. § 9 (emphasis added).  In accordance with the provisions of the FAA, we will confirm the Arbitration Award.

      An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: EQUIMED, INC., | : | |
|       Debtor | : | |
| THE ESTATE OF EQUIMED, INC. | : | |
|       Petitioner | : | |
| | : | CIVIL ACTION |
|       v. | : | |
| | : | NO. 05-1815 |
| ERNST & YOUNG, LLP | : | |
|       Respondent and | : | |
|       Cross-Movant | : | |

**ORDER**

AND NOW, this 30th day of June, 2006, upon consideration of Petitioner Estate of Equimed, Inc.'s Petition To Vacate Arbitration Award (Doc. No. 1) and Motion For Summary Judgment Or In The Alternative To Issue An Order For A Hearing On The Merits Preceded By A Discovery Period (Doc. No. 25), as well as Respondent Ernst & Young LLP's Answer To Petition To Vacate Arbitration Award And Cross-Motion To Confirm Arbitration Award (Doc. No. 5), and all papers filed in support thereof and in opposition thereto, it is ORDERED that Petitioner's Petition is DENIED, Petitioner's Motion for Summary Judgment is DENIED, and Respondent's Cross-Motion is GRANTED. The Arbitration Award is hereby CONFIRMED. Judgment is entered in favor of Respondent Ernst & Young, LLP.

IT IS SO ORDERED.

BY THE COURT:

/s R Barclay Surrick

_____
R. Barclay Surrick, Judge